UNITED STATES of America,
Plaintiff–Appellee,

v.

Carlos LOPEZ–SANDOVAL,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Moises GONZALEZ, Defendant–
Appellant.

Nos. 97–30167, 97–30178.

United States Court of Appeals,
Ninth Circuit.

Submitted June 1, 1998 *.

Decided June 15, 1998.

* The panel unanimously found this case suitable for decision without oral argument. Fed. R.App. P. 34(a) and Ninth Circuit Rule 34–4.

Robert W. Goldsmith, Seattle, Washington, for defendant-appellant Carlos Lopez–Sandoval.

Antonio Salazar, Seattle, Washington, for defendant-appellant Moises Gonzalez.

Bruce F. Miyake, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

Before: LAY,** GOODWIN, and PREGERSON, Circuit Judges.

** Hon. Donald P. Lay, Senior Circuit Judge for the Eighth Circuit Court of Appeals, sitting by desig- nation.

PREGERSON, Circuit Judge:

Carlos Lopez–Sandoval and Moises Gonzalez appeal their sentences for conspiracy to distribute cocaine under 21 U.S.C. §§ 841 and 846, distribution of cocaine under 21 U.S.C. § 841, and possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841 and 812. Lopez–Sandoval and Gonzalez contend that the district court erred by applying a firearm enhancement under U.S.S.G. § 2D1.1(b)(1). We affirm.

Gonzalez also appeals the district court's two-level increase to his sentence under U.S.S.G. § 3B1.1(c) because the court determined that Gonzalez was a leader of the conspiracy. We reverse the district court's ruling that imposed the two-level enhancement under § 3B1.1(c).

## BACKGROUND

In August 1996, members of the Skagit County Interlocal Drug Enforcement Unit ("SCIDEU") initiated an undercover investigation of Carlos Lopez–Sandoval and Moises Gonzalez. Between August 1996 and November 1996, the defendants were involved in four different distributions of cocaine to an informant working with SCIDEU. The defendants were arrested during the last cocaine transaction on November 7, 1997. Following their arrest, the police executed search warrants at each defendant's residence.

The police seized 8.52 grams of crack cocaine, a .22 caliber handgun, and a 7 mm magnum rifle found at Lopez–Sandoval's residence. The .22 caliber handgun was found between a mattress and box spring in the master bedroom. A box of ammunition and several identification cards for Lopez–Sandoval also were found between the mattress and the box spring. From Gonzalez's residence, the police seized cocaine, heroin, marijuana, and two handguns.

---

1. On May 18, 1998 the Supreme Court decided *Bousley v. United States*, —— U.S. ——, 118 S.Ct. 1604, 140 L.Ed.2d 828, which discusses *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). In *Bailey*, the Supreme Court held that a defendant cannot be found guilty of "using" a firearm in violation of 18 U.S.C. § 924(c)(1) unless the Government shows

## I. Firearm Enhancement

### A. Standard of Review

■ We review a district court's interpretation of the Sentencing Guidelines *de novo*. *See United States v. Parrilla*, 114 F.3d 124, 126 (9th Cir.1997). "We review the district court's finding that [a defendant] possessed firearms in connection with a drug conspiracy for clear error." *United States v. Cazares*, 121 F.3d 1241, 1244 (9th Cir.1997).

### B. Section 2D1.1(b)(1)

■ Sentencing Guideline § 2D1.1(b)(1) provides: "If a dangerous weapon (including a firearm) was possessed [during a drug-trafficking crime], increase by 2 levels." Application Note 3 to § 2D1.1 explains: "The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons." In applying this enhancement, "the court need not find a connection between the firearm and the offense. If it finds that the defendant possessed the weapon during the commission of the offense, the enhancement is appropriate." *United States v. Diego Restrepo*, 884 F.2d 1294, 1296 (9th Cir.1989).[1] But the adjustment will not be applied if it is "clearly improbable that the weapon was connected with the offense." *See* U.S.S.G. § 2D1.1, Commentary (n.3); *United States v. Willard*, 919 F.2d 606, 609 (9th Cir.1990).

### 1. Possession of the Weapon

■ Defendants contend that the district court erred in finding that they "possessed" weapons during the commission of the drug offense because neither of them was carrying a weapon when they were arrested. But, for the enhancement to apply, a defendant need not be carrying a weapon when he is arrested.

---

"active employment of the firearm." *Id.* at 144, 116 S.Ct. 501. But this holding does not help the defendants in this case, because the Court in *Bailey* clarified that the government can seek enhancement under § 2D1.1(b)(1) by showing that a firearm was *possessed* during the commission of the offense. *Id.* at 150, 116 S.Ct. 501.

In *United States v. Willard,* the defendant was arrested in his car without any weapons, but the police later found thirty-one firearms at his place of business. The defendant admitted that he was involved in the drug trade for two or three years and that some of the firearms found at his business belonged to him. *Id.* We upheld a weapons enhancement under U.S.S.G. § 2D1.1(b)(1), explaining that: "for purposes of the firearm enhancement, the court ... look[s] to all of the offense conduct, not just the crime of conviction." *Id.* at 610. Thus, "the key is whether the gun was possessed during the course of criminal conduct, not whether it was 'present' at the site." *United States v. Stewart,* 926 F.2d 899, 901 (9th Cir.1991).

In this case, the defendants were involved in several drug transactions over a three month period. Following their arrests, the police executed search warrants at the defendants' residences. Lopez–Sandoval's handgun was found in his residence next to several of his identification cards. In his brief on appeal, Gonzalez admitted that he constructively possessed the two handguns found in his closet. We have upheld an enhancement for weapons possession when the record showed that on the day that a drug transaction took place, the defendant was living in a place where a weapon was found four months later. *See United States v. Pitts,* 6 F.3d 1366, 1373 (9th Cir.1993) (defendant held to possess shotgun during commission of drug offense because he resided in home where shotgun found four months after the drug delivery even though the drug delivery did not occur at his residence).

■ Moreover, in *Stewart,* we upheld a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) even though the weapon was found at the defendant's home some fifteen miles from the place where the overt act of drug distribution took place. We explained that:

> Stewart was convicted of conspiracy. While the overt act of distribution of methamphetamine may well have occurred at McKenzie highway, there is no indication that the conspiracy was limited to that site. The conspiracy charge has no definitive location, and the mere fact that the gun

was not present at the place where the overt act took place does not mean that it had no connection with the conspiracy.... Since Stewart stipulated to the possession of a machine gun at the same time as his conspiracy charge, we find that he did possess the gun during the commission of a drug offense.

*Id.* at 901–02. In this case, both defendants were arrested while participating in a conspiracy to distribute drugs. There is no indication that this conspiracy was limited to the sites where the overt acts of drug distribution took place. Further, after the defendants were arrested, the police found weapons at their residences. Because the defendants "possessed" weapons at their residences at the time that their conspiracy was ongoing, under *Stewart,* they possessed weapons during the commission of the drug conspiracy.

For the above reasons, we determine that the district court did not clearly err when it concluded that the defendants possessed weapons during the commission of the drug offenses.

## 2. Not Clearly Improbable That Weapon Connected to the Offense

As indicated above, an enhancement under U.S.S.G. § 3B1.1(c) is appropriate if the defendant possessed a firearm during the commission of the offense unless it is "clearly improbable that the weapon was connected" to the drug conspiracy. *See* U.S.S.G. § 2D1.1, Commentary (n. 3). We have recognized the likely connection between drug trafficking and the use of weapons:

> [I]t is a matter of common knowledge that some persons who have firearms in their possession commit acts of violence to avoid arrest. A person who purchases controlled substances may be defrauded or robbed of his funds prior to the transaction by unscrupulous drug dealers. A person in possession of controlled substances is also vulnerable to a [forcible] taking of his contraband by other addicts or thieves. It is clearly probable that persons who traffic in narcotics would arm themselves to avoid these hazards.

*United States v. Heldberg,* 907 F.2d 91, 94 (9th Cir.1990).

Gonzalez argues that because the seized handguns were unloaded it is "clearly improbable" that they were connected to the drug conspiracy. We rejected a similar argument in *Heldberg,* where we explained that a handgun is a dangerous weapon possessed during the commission of an offense under U.S.S.G. § 2D1.1(b)(1) if it "appears to be a dangerous weapon" and it "may readily be converted to expel any projectile by the action of an explosive." *Id.* (internal quotations omitted) (citation omitted). Applying this standard, we held that an unloaded weapon was a "dangerous weapon" under the Guidelines: "Obviously, a .25 caliber semi-automatic handgun may be readily converted to expel a projectile simply by loading it with ammunition. Moreover, it is evident that an unloaded .25 caliber semi-automatic handgun appears to be a dangerous weapon." *Id.* Likewise, in this case, the unloaded handguns are "dangerous weapons" because they could be easily converted to expel a projectile simply by loading them with bullets.

■ Commentary note 3 to U.S.S.G. § 2D1.1 explains that it is "clearly improbable" that a weapon is involved in a drug offense where a defendant is arrested at his home and the police find an unloaded hunting rifle in his closet.[2] In this case, the police found a .22 caliber handgun in Lopez–Sandoval's residence, and two handguns in Gonzalez's residence. In sentencing Gonzalez, the district court noted that the handguns found in Gonzalez's home "were not hunting rifles." A sentencing court properly may take into consideration the type of weapon found in the defendant's residence in determining whether the weapon was connected to the drug offense. *See also Stewart,* 926 F.2d at 902 (a machine gun cannot be viewed as a sporting piece); *Heldberg,* 907 F.2d at 93 ("A handgun, such as a .25 caliber semi-automatic revolver, is designed to be used to threaten, injure, or kill human beings; it is not ordinarily used to hunt game.").

■ Therefore, the facts in the instant case demonstrate that it was *not* clearly improbable that the handguns found in the defendants' residences were connected with the drug conspiracy.

## II. Upward Adjustment for Organizer or Leader of Drug Conspiracy

### A. Standard of Review

■ A district court's determination that a defendant was an "organizer or leader" for purposes of enhancement under U.S.S.G. § 3B1.1(c) is reviewed for clear error. *United States v. Ponce,* 51 F.3d 820, 826 (9th Cir.1995). "The district court need not make specific findings of fact in support of an upward role adjustment." *Id.*

### B. Organizer or Leader

Gonzalez argues that the district court erred by increasing his base offense level by two under U.S.S.G. § 3B1.1(c) for his role as an "organizer, leader, manager or supervisor" of the cocaine conspiracy. Although the district court was not required to make specific findings to support its two-level enhancement, the court nonetheless did make such findings. The district court said:

> [Gonzalez's co-conspirators] couldn't speak English and [Gonzalez] is interpreting the English. I don't know what a leader would be other than that.... If they don't speak English and they are talking to people that speak English, what else could it be? *Without [Gonzalez], it wouldn't have happened ....* That is a leader.... [Gonzalez] says they could not read or write, could not even write their own name.... So, he provided the interpretation of Spanish into English and English into Spanish, *without which the deals wouldn't have gone down.* That appears to the court to be a leader.

(Emphasis added.)

■ First, the district court applied an incorrect test in determining whether Gonzalez was an "organizer or leader." In *United States v. Harper,* 33 F.3d 1143, 1151 (9th Cir.1994), the district court similarly held

---

**2.** The district court did not consider the unloaded rifle found in Lopez–Sandoval's closet when it

enhanced his sentence for possession of a weapon during the commission of a drug offense.

that a defendant was a leader because "without her expertise, there would not have been an attempted robbery or the conspiracy...." *Id.* In *Harper*, we held that this "but for" test was inappropriate, and explained that the district court instead must determine whether the defendant "exercised some control over others involved in commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime." *Id.* (citing *United States v. Mares–Molina*, 913 F.2d 770, 773 (9th Cir.1990)).

■ Second, the fact that Gonzalez was a translator does not automatically show that he was a leader of his co-conspirators. In *United States v. Ramos–Oseguera*, 120 F.3d 1028, 1038 (9th Cir.1997), the defendant appealed an enhancement under U.S.S.G. § 3B1.1(c), arguing that "the court's reliance on the importance of her role as a translator was inadequate to support a finding that she was a manager or supervisor." We acknowledged that "[w]ithout a showing that the defendant had control over others, even a defendant with an important role in an offense cannot be deemed a manager." *Id.* (citing *United States v. Hoac*, 990 F.2d 1099, 1110–11 (9th Cir.1993) (holding that unless he controlled or organized others, a defendant cannot be found an organizer, leader, manager or supervisor)). There is no evidence that Gonzalez exercised any control or organizational authority over his co-conspirators.

■ Despite the district court's improper reliance on the "but for" test at the sentencing hearing, the government argues that the presentence report ("PSR") provides an alternate basis to support the enhancement because it shows that Gonzalez was an "organizer or leader" of the drug conspiracy. Application note 4 to U.S.S.G. § 3B1.1 directs the court to consider the following factors when determining whether a defendant was an organizer or leader:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

The government argues that Gonzalez is an "organizer or leader" because the PSR shows that he *negotiated the price for the drugs and arranged when and where the deals would occur.* In support of this argument, the government cites *United States v. Varela*, 993 F.2d 686 (9th Cir.1993) and *United States v. Barnes*, 993 F.2d 680 (9th Cir. 1993).

The government's argument falls short. Gonzalez's PSR does not state that he set the price for the drugs, nor does it show that Gonzalez was the person who decided the time and place for the drug transactions.[3] At the sentencing hearing, Gonzalez testified that "[he] was told the price, the location and the time [of the drug transaction]."[4] Therefore, the PSR only shows that Gonzalez was the defendant who relayed information about the time and location of the drug transactions and perhaps the price of the drugs. This is not enough to qualify Gonzalez as an "organizer or leader" under *Varela* and *Barnes*.

In *Varela*, the court found that the defendant "coordinated the procurement and distribution of drugs" because he was the sole middleman between the buyer and various drug suppliers. *Varela*, 993 F.2d at 691. Moreover, *Varela* negotiated and carried out all the drug transactions. He also transported and delivered the drugs, and he located the drug suppliers. *Id.* We upheld the enhancement of Varela's sentence because the

---

3. The PSR merely contains general statements. For example, the report states that "an undercover detective contacted Moises Gonzalez and negotiated the purchase of six ounces of cocaine, for $3,750, at the same location on North 26th Street." In this statement, as throughout the PSR, it is unclear whether Gonzalez, the informant, or the detective set the price. Even if Gonzalez mentioned a price, it is not clear that he "set" the price. Instead, the price could have been determined by one of his co-conspirators or by one of the defendants' suppliers.

4. Before he testified that he was "told" the time and location of the drug transaction, Gonzalez stated that *he* set the time and location of the deal. This testimony is consistent with a finding that Gonzalez "set" the time in terms of telling the detective when to meet, but was merely conveying information that was sent by his co-conspirators.

facts showed that he "coordinated the activities of the other participants to the extent necessary to complete the transaction." *Id.* at 692. In *Barnes*, the defendant was the principal negotiator with the government undercover agent and he admitted that he had authority over another co-conspirator. *Barnes*, 993 F.2d at 685.

Unlike *Varela*, Gonzalez was not the sole middleman between the buyer and the suppliers. All of Gonzalez's co-conspirators participated in the drug transactions and all of the defendants met the informant and detectives face to face. Moreover, there is no evidence that Gonzalez located or made the connection with the drug suppliers. Unlike *Barnes*, Gonzalez had no authority over his co-conspirators, and he did not make any more money than they did.

Finally, our decision in *United States v. Avila*, 95 F.3d 887 (9th Cir.1996), calls for a reversal of the two-level enhancement imposed in this case. In *Avila*, we reversed the district court's four-level enhancement under U.S.S.G. § 3B1.1(c). The defendant in *Avila* was the sole negotiator with the informant and the undercover detective regarding the quantity and price of the cocaine, he negotiated a $1,000 fee for each kilogram of cocaine he delivered, he was the only member of the conspiracy who met face to face with the undercover detective, and he drove to various locations to obtain the cocaine and then transported it to the site of the drug transaction. *Id.* at 890. Notwithstanding these facts, we reversed the four-level enhancement because there was "no evidence in the record that Avila exercised any control or organizational authority over others and thus no factual basis [existed] for characterizing him as an organizer or leader." *Id.* We also noted that there was no proof that the defendant set the price of the drugs rather than merely relaying the price set by his supplier. *Id.* at 890 n. 5.

Applying *Avila*, Gonzalez similarly cannot be characterized as an organizer or leader. As noted above, Gonzalez's PSR does not show that he had any control over his co-conspirators; nor does it show that he had organizational or decision-making authority.

For the above stated reasons, we find that the district court clearly erred by enhancing Gonzalez's sentence under § 3B1.1(c) for being an "organizer or leader" of the drug conspiracy.

## CONCLUSION

We AFFIRM the district court's two-level enhancement of Lopez–Sandoval and Gonzalez's sentences under § 2D1.1(d)(1). We REVERSE the district court's decision imposing the two-level enhancement of Gonzalez's sentence under § 3B1.1(c) and REMAND for further proceedings consistent with this opinion.