**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Gordon Paul COOPER, Defendant–
Appellant.**

**No. 97–50296.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 8, 1998.

Decided April 9, 1999.

---

5. Petitioner McDowell's request for sanctions is denied.

1194

Roger S. Hanson, Santa Ana, California, for the defendant-appellant.

Melanie K. Pierson, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: CANBY and KLEINFELD, Circuit Judges, and PANNER, District Judge.*

* The Honorable Owen M. Panner, Senior United States District Judge for the District of Oregon, sitting by designation

PANNER, District Judge:

Gordon Paul Cooper appeals his convictions and sentence after a jury found him guilty of conspiracy, 18 U.S.C. § 371; aiding and abetting the unlawful disposal of sewage sludge, 33 U.S.C. §§ 1319(c)(2)(A) and 1342; and mail fraud, 18 U.S.C. § 1341. Cooper contends that he complied with federal regulations governing sewage sludge; that he cannot be criminally liable for violating a permit to which he was not a party; that the Clean Water Act is void for vagueness as applied; that the prosecution failed to disclose an exculpatory FBI report; that a government witness falsely testified that he had no agreement with the government; that the prosecutor committed misconduct during final argument; and that the district court improperly enhanced the sentence.

We affirm.

## BACKGROUND

Cooper has been in the business of hauling sewage sludge for more than thirty years. In 1986, Cooper and Larry Vaughan incorporated Chino Corona Farms (CCF) in San Juan Capistrano, California. CCF transported, composted, and sold sewage sludge from several small cities.

Cooper was CCF's secretary-treasurer and Vaughan was its president. The district court described Cooper as the "nuts-and-bolts guy" who knew the business of handling sewage sludge, while Vaughan was the "bookkeeper partner" who stayed in CCF's office handling the finances.

The City of San Diego (the City) was shipping its raw sewage to a treatment site on Fiesta Island, where the sewage was partially dried but not composted. The City processed its sewage under a National Pollutant Discharge Elimination System (NPDES) permit issued by the California Regional Water Quality Board, San Diego

Region (the Water Board). The NPDES permit required that the City "give prior written notice ... of any change(s) planned in the discharger's [i.e., the City's] sludge use or disposal practice." The NPDES permit also required that the City regularly report on its disposal of sewage sludge, describing the location, the rate of application in pounds per acre per year, and subsequent uses of the land.

In 1990, the City awarded CCF a contract to remove sewage sludge from Fiesta Island. CCF agreed to transport sewage sludge for about $20 per ton (later raised to about $24 at CCF's request) to Thermal, California, where CCF would compost the sludge. Because the City paid CCF by weight, the contract required that CCF submit weighmaster certificates (also called weigh or weight tickets) to verify the weight of sludge in each truckload. Weighmaster certificates are an official record of a truck's gross weight and the weight of its cargo. Valid weighmaster certificates are produced by a licensed scale and signed by the scale's operator. Cooper was convicted of mail fraud partly because CCF used false weighmaster certificates.

The contract required that CCF "obtain City approval to haul to the proposed site for which the required documentation has been submitted." CCF was required to submit bills of lading to show each truckload's ultimate destination. The contract did not refer to the City's NPDES permit.

CCF retained an attorney, James W. Anderson, who had experience on a Water Board, to determine whether CCF needed a permit to treat sewage sludge at its Thermal site. Anderson, who worked with Cooper, negotiated a memorandum of agreement with the governing Water Board. No permit was required. CCF voluntarily agreed to take precautions, such as building berms and drainage controls, to keep sewage sludge from entering surface or ground waters.

Soon after it began hauling for the City, CCF was overwhelmed by the volume of sewage sludge. CCF's site manager testi-fied at trial that CCF received more sewage sludge each day at the Thermal site than it could compost in a month.

To prevent a further backlog of sewage sludge at the Thermal site, Cooper arranged to haul sludge directly from Fiesta Island to Mexicali, Mexico, without composting it at Thermal. In late spring 1992, after obtaining permission from authorities in Mexico, Cooper sought approval from the City and the Water Board. The City and Water Board accepted the Mexicali site because they decided they had no jurisdiction over it.

Cooper hired Manuel Mier, a citizen of Mexico, to supervise truckers hauling sludge from Fiesta Island to Mexicali. CCF paid Mier $500 a week plus expenses. Mier reported only to Cooper.

When CCF first hired a trucking company to haul sludge from Fiesta Island to its Thermal site, CCF paid by weight and required weighmaster certificates. According to Mier, however, that changed when CCF began hauling sludge to Mexicali. Mier testified that Cooper told him not to have the trucks weighed. Instead, Cooper instructed him to create phony weighmaster certificates using blank forms Cooper supplied. Mier was to write in a fabricated cargo weight so that the gross weight of the truck would be no more than 80,000 pounds, which Mier understood to be the maximum allowed by California law. Mier (or others who helped him) wrote in Mier's name and signature as the deputy weighmaster. Mier then used the false weighmaster certificates to prepare invoices for billing the City.

Mier also testified that he mailed or personally delivered completed weighmaster certificates and invoices to Cooper. Cooper testified that he often received envelopes from Mier, but never looked at the weighmaster certificates inside them.

In spring 1993, after Mexican authorities detained trucks carrying sewage sludge for CCF, Cooper decided that he needed a different site for sludge disposal. Cooper

knew that in February 1993, effective February 1994, the United States Environmental Protection Agency (EPA) had issued new regulations governing the land application of sewage sludge. 40 C.F.R. Part 503. The new regulations provided that if sewage sludge met standards for pathogens, trace minerals, and "vector attraction" (i.e., attraction to rats or insects), the sludge could be applied directly to agricultural land as fertilizer with few restrictions. Cooper obtained an analysis of Fiesta Island sewage sludge, showing that the sludge met the new regulations' highest standards for sludge. Cooper concluded that the federal regulations authorized him to apply the sewage sludge directly to agricultural land.

For his new site, Cooper chose a farm owned by Jay Mason near Seeley, California, in Imperial County. Mason had purchased hundreds of tons of composted sludge from CCF's Thermal site. Cooper did not notify the City or the Water Board of his new site. Cooper testified that he did telephone the EPA's regional "sludge coordinator" about obtaining a permit for the Mason farm operation, and was told that no permit was required. There was no documentation or follow-up correspondence concerning Cooper's telephone call to the EPA.

The Planning Director for Imperial County, Urich Heuberger, testified that in spring 1993, CCF had asked about obtaining a conditional use permit for applying composted sewage sludge from CCF's Thermal site to certain agricultural land in the county. When Heuberger learned about the application of uncomposted sewage sludge at the Mason farm, he ordered CCF to stop applying sludge to county farm land without a permit.

By shipping sewage sludge directly from Fiesta Island to Mason's farm, CCF saved the expense of composting the sludge at the Thermal site, as well as the cost of shipping to and from Thermal. Cooper told Mason that rather than charge him for the sewage sludge, CCF would pay five dollars for each ton applied to his farm.

Cooper assured Mason that he had permits for the sludge and that it was harmless.

Cooper arranged for trucks to leave Fiesta Island in the late afternoon so they arrived at the Mason farm during twilight. The sludge was immediately worked into the soil. Cooper testified that CCF hauled sludge at night to avoid traffic and to prevent sunlight from dissipating nitrogen.

During the several weeks in March and April 1993 that CCF shipped Fiesta Island sewage sludge to the Mason farm, Mier submitted weighmaster certificates to CCF indicating that the sludge was still being shipped to Mexicali. Mier testified that he did so under orders from Cooper. CCF sent the false weighmaster certificates to the City to support its invoices.

The owners of the two trucking companies that hauled sewage sludge for CCF to the Mason farm testified that Cooper paid them by the truckload, not by weight. Cooper did not ask them to weigh the truckloads. A foreman for one of the trucking companies testified that Cooper refused his offer to weigh trucks.

In late April 1993, acting on a tip from Russell Rodvold, the owner of a trucking company, city employees followed a truck hauling sewage sludge for CCF from Fiesta Island to the farm in Imperial County. When the City's auditors discovered that CCF had lied about the sludge's destination, they examined CCF's invoices and realized that the weighmaster certificates were false. The City Auditor found that out of about 1,500 weighmaster certificates submitted by CCF listing truckloads sent to Mexicali, about 425 truckloads, or 10,000 tons of sewage sludge, were dumped at the Mason farm.

When the City canceled its contract with CCF, Vaughan and others at CCF immediately blamed Cooper for the fiasco. A letter dated May 4, 1993, signed by Cooper and addressed to Vaughan, CCF's president, stated:

Due to the problems with Contract # B1216/90 with the City of San Diego, problems which have arisen directly through my actions, I hereby tender my resignation as Director and officer of Chino–Corona Farms, Inc., a California corporation, efefective [sic] immediately. I acknowledge that the decisions I made with regard to the diversion of wet bio-solids material from the City of San Diego directly to agricultural users in Imperial [C]ounty were my own and done without the knowledge of the other directors or officers of Chino–Corona Farms, Inc.

At trial, Cooper testified that he did not write the letter and that its statements were false. He said that he signed the letter only because Vaughan told him the City would pay CCF about $566,000 for outstanding invoices if Cooper resigned. The letter did not save CCF. When the City wouldn't pay CCF, CCF couldn't pay what it owed the trucking companies, and it was forced out of business.

The FBI investigated CCF. During a search of CCF's offices pursuant to a warrant, an FBI agent, Jennifer Esposito, showed Cooper a copy of the City's NPDES permit. Esposito testified at trial that Cooper thumbed through the NPDES permit and appeared familiar with it, referring to it as a Water Board permit. Esposito testified that Cooper said "he was aware that Chino Corona Farms was required to report all sites where they dumped sludge taken from Fiesta Island to the Regional Water Quality Control Board and the City of San Diego."

When the case went to trial, Mier was one of the key witnesses against Cooper. On cross-examination, the defense established that Mier had told at least three conflicting stories about how and where he had obtained the blank weighmaster certificates used for the Mexicali operation. First, in an FBI report from March 1996, Mier said that Cooper went to a print shop in Mexicali by himself and later gave Mier a box of weighmaster certificates. Second, testifying before the grand jury in April 1996, Mier said that he went into a print shop in Mexicali with Cooper, translated for Cooper, and helped order the weighmaster certificates. Third, at trial, Mier testified that he went to a Mexicali print shop with Cooper and another person (either "Barilla" or "Padilla"), and that the three men arranged for printing the certificates.

Mier conceded that he had signed weighmaster certificates knowing that they were false. The defense also pointed out that Mier testified to the grand jury that he had estimated truckload weights without Cooper's knowledge on the assumption that Cooper would approve. The defense showed that CCF reimbursed Mier $5.00 for each truckload weighed, giving Mier an incentive to use false weighmaster certificates and pocket up to $200 a day. Mier admitted that during the Mason farm project, he had driven a truck himself, earning $300 per truckload, even though as supervisor he should not have been driving.

The defense was missing a document that would have further impeached Mier: an FBI report stating that a Mexicali print shop, identified by Mier as having produced the weighmaster certificates, had no records or knowledge of the certificates. The defense did not learn about the FBI report until after the trial.

Cooper testified at trial. He denied telling Mier to make false entries in weighmaster certificates. Cooper testified that he never looked at the weighmaster certificates before they were sent to the City with invoices. He stated that anyone familiar with legitimate weighmaster certificates would have noticed obvious discrepancies in those submitted by Mier. For example, Mier's certificates gave weights in single pound increments, more accurately than any truck scale. They were also numbered in sequence, while certificates normally would have gaps in the sequence because of other trucks being weighed.

Cooper denied seeking permission to transport sewage sludge to Mexicali. Witnesses from the City and Water Board

contradicted that testimony, and the prosecution produced a letter from the Water Board, dated June 1992, addressed personally to Cooper at CCF. The letter stated that it was "in response to your verbal [i.e., oral] request for approval to transport sewage sludge to Mexico." Cooper also denied talking to Heuberger, the planner for Imperial County.

Cooper denied telling Esposito, the FBI agent, that he was familiar with the City's NPDES permit. As the district court summarized Cooper's testimony, Cooper blamed Mier and Vaughan for the false weighmaster certificates, while depicting himself as "just the dummy that they all danced around."

Besides Mier's testimony, the prosecution presented evidence and testimony that contradicted Cooper's testimony. Russell Rodvold, the trucking company owner who later tipped off the City that CCF was shipping sludge to the Mason farm, had hauled sludge for CCF to the Thermal site when CCF was paying by weight. Rodvold testified that when he complained to Cooper that it was taking too long to dump sludge, Cooper suggested that Rodvold drive his trucks over the scales more than once to generate false weighmaster certificates for additional payments. Rodvold refused, considering the practice fraudulent. At trial, Cooper admitted making the suggestion.

The manager for another trucking company testified that she was surprised to learn that CCF had used her business address as the address of the certified scale on weighmaster certificates. When she confronted Cooper, he told her that he was aware of it and that she should not worry. At trial, Cooper denied talking to the owner about the certificate.

The jury convicted Cooper on all five counts of the indictment. After a sentencing hearing, the district court adopted the presentence report's recommendations and sentenced Cooper to fifty-one months' imprisonment.

## DISCUSSION

### I. Preliminary Legal Issues

■ The district court denied Cooper's motion to dismiss the indictment. This court reviews the district court's rulings on legal issues de novo. *United States v. Lester*, 85 F.3d 1409, 1410 (9th Cir.1996).

#### A. Federal Regulations Do Not Supersede the NPDES Permit

■ Cooper argues that he did not need approval from the City or the Water Board to apply sewage sludge directly to the Mason farm because federal regulations preempted or superseded the notice requirements of the City's NPDES permit. At trial, the district court allowed Cooper to testify that he had relied on the federal regulations, and to present expert testimony that the Fiesta Island sewage sludge met federal standards for direct land application.

■ We agree with the district court that Cooper erroneously assumes that the federal sewage sludge regulations relieved him of a duty to comply with the City's NPDES permit. By their own terms, the regulations do not usurp local control over the disposal of sewage sludge. *See* 40 C.F.R. § 503.5(b) ("Nothing in this part precludes a State or political subdivision thereof ... from imposing requirements for the use or disposal of sewage sludge more stringent than the requirements in this part or from imposing additional requirements for the use or disposal of sewage sludge."). The Clean Water Act preserves local control. *See* 33 U.S.C. § 1345(e) ("The determination of the manner of disposal or use of sludge is a local determination."). The regulations encourage direct land application of sewage sludge, but they do not require that states or local governments allow it. *See Welch v. Board of Supervisors*, 888 F.Supp. 753, 758 (W.D.Va.1995) (EPA's "mere preference [for land application] is vastly different from legislation forcing states and localities to permit land application"). The

district court properly concluded that the federal regulations do not supersede the NPDES permit.

## B. Non–Permittees May Be Liable for Violating a Permit

■ Cooper argues that he cannot be liable for violating the City's NPDES permit because he was not a party to the permit. He contends that the government has criminalized conduct that at worst was a breach of CCF's contract with the City.

The Clean Water Act imposes criminal liability on "[a]ny person who knowingly violates . . . any permit condition or limitation implementing any of such sections [of the Act] in a permit issued under section 1342 of this title." 33 U.S.C. § 1319(c)(2)(A). For Cooper to be criminally liable, there first must be a valid NPDES permit. The government presented evidence that the Water Board, acting under authority delegated by the EPA, properly issued the City's NPDES permit. *See* 33 U.S.C. § 1342(b) (state or regional agency may administer NPDES permits if state or regional regulatory scheme meets federal criteria); *Russian River Watershed Protection Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1138–39 (9th Cir. 1998) (describing statutory authority for Water Board).

The statute imposes criminal liability on "*[a]ny person* who knowingly violates" a permit condition. 33 U.S.C. § 1319(c)(2) (emphasis added). The phrase "any person" is broad enough to cover permittees and non-permittees alike. *See United States v. Brittain,* 931 F.2d 1413, 1419 (10th Cir.1991); *United States v. Iverson,* 162 F.3d 1015, 1025 (9th Cir.1998) ("person" includes "any responsible corporate officer," 33 U.S.C. § 1319(c)(6), which includes a person who "has authority to exercise control over the corporation's activity that is causing the discharges").

■ The government also had to establish beyond a reasonable doubt that Cooper knowingly violated a condition of the NPDES permit. We need not resolve whether our law requires the government to prove that Cooper, who was not the permittee, knew of the permit and its requirements. *See United States v. Weitzenhoff,* 35 F.3d 1275, 1284 n. 5 (9th Cir. 1994) (as amended). Here, the district court held the government to the higher standard, instructing the jury that Cooper "must know his conduct violates the City's permit."

Under this higher standard, there was ample evidence of Cooper's knowledge of the NPDES permit and its application to his conduct. Municipal sources of sewage sludge must operate under NPDES permits. Cooper, who had transported sewage sludge for thirty years and considered himself an expert on the subject, could hardly be ignorant of NPDES permits. *Cf. United States v. International Minerals & Chem. Corp.,* 402 U.S. 558, 565, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (persons dealing with "obnoxious waste materials" "must be presumed" to be aware of applicable regulations). Cooper obtained legal advice to determine whether a permit was required when CCF was composting Fiesta Island sewage sludge at its Thermal site. Cooper sought approval from the City and the Water Board when he wanted to transport sludge to Mexicali, evidence that he knew about the NPDES permit and its application to him. An FBI agent testified that when she showed Cooper the City's NPDES permit, he thumbed through it and said he knew what it was. The evidence was sufficient to establish that Cooper knowingly caused a violation of the City's NPDES permit, making him criminally liable under § 1319(c)(2).

## C. The Clean Water Act Provisions Are Not Vague as Applied

■ Cooper argues that 33 U.S.C. §§ 1319 and 1342 are void for vagueness as applied because the statutes do not distinguish between different grades of sewage sludge, which range from raw sewage to the more processed sewage sludge at issue here.

■ This court reviews de novo whether a law is void for vagueness. *United States v. Hockings*, 129 F.3d 1069, 1070 (9th Cir.1997). "A criminal statute is not vague if a 'reasonable person of ordinary intelligence' would understand what conduct the statute prohibits." *Iverson*, 162 F.3d at 1021 (quoting *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1493 (9th Cir.1996)). "[W]here, as here, a criminal statute regulates economic activity, it generally 'is subject to a less strict vagueness test, because its subject matter is more often narrow and because businesses can be expected to consult relevant legislation in advance of action.'" *Id.* (quoting *United States v. Doremus*, 888 F.2d 630, 634 (9th Cir.1989)). "[A] scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

The Clean Water Act defines "sewage sludge" as a "pollutant." 33 U.S.C. § 1362(6). A reasonable person who read the statutory definition and the City's NPDES permit would not conclude that the federal regulations encouraging land application of sewage sludge create an ambiguity in the statutory definition. The district court correctly concluded that § 1319(c)(2)(A) was not void for vagueness as applied.

Cooper argues that CCF's contract with the City requires that CCF comply with later enacted federal regulations. This argument is meritless. Cooper's actions did not comply with the new regulations because the new regulations did not supersede the City's NPDES permit requirements.

## II. Use of Manuel Mier as a Witness

Cooper contends that the government's use of Mier as a witness requires reversal because (1) the government failed to turn over an exculpatory FBI report concerning Mier, violating its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) the government allowed Mier to commit perjury; and (3) the government failed to disclose an immunity agreement with Mier.

### A. FBI Report

■ Cooper claims that the government violated his rights under *Brady* by concealing an exculpatory FBI report. The government contends that the FBI report was available before trial for defense review, and that the report was not material.

■ To prevail on his *Brady* claim, Cooper must show that "(1) the evidence was exculpatory or impeaching; (2) it should have been, but was not produced; and (3) the suppressed evidence was material to his guilt or punishment." *Paradis v. Arave*, 130 F.3d 385, 392 (9th Cir.1997) (citing *United States v. Steinberg*, 99 F.3d 1486, 1489 (9th Cir.1996)). Evidence is material under *Brady* only if there is a reasonable probability that the result of the proceeding would have been different had it been disclosed to the defense. *United States v. Service Deli, Inc.*, 151 F.3d 938, 943 (9th Cir.1998). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Here, the FBI report stated that an investigation of the Mexicali print shop identified by Mier as the source of weighmaster certificates revealed no evidence that the print shop had ever printed for Cooper, Mier, or CCF. The report would have impeached Mier, a government witness, so the first part of the *Brady* test is met. *Service Deli*, 151 F.3d at 943.

The parties dispute whether the government properly disclosed the report. The district court was not able to resolve the factual dispute.

Remand for an evidentiary hearing on disclosure is unnecessary, however, because the FBI report was not material. The defense was able to impeach Mier extensively. The defense established both through cross-examining Mier and through direct examination of Strange that Mier gave conflicting versions of events to FBI agents, to the grand jury, and at trial. The defense showed that Mier had an economic motive for falsifying the weighmaster certificates. The defense was also able to argue that Mier was lying when he denied the existence of an agreement with the government. One additional item of impeachment, showing that Mier lied about the source of blank weighmaster certificates, could not damage Mier's credibility much more than it already had been.

There was ample evidence of Cooper's guilt even without Mier's testimony. Given the already extensive impeachment of Mier and the independent evidence of Cooper's guilt, we conclude that the FBI report does not "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 115 S.Ct. 1555. The government's case did not rise or fall on Mier's credibility.

### B. Perjured Testimony

 "If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that testimony is false, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury verdict." *Ortiz v. Stewart*, 149 F.3d 923, 936 (9th Cir.1998). Because Cooper did not argue at trial that the government presented perjured testimony, this court may review only if there was plain error affecting substantial rights. *People of Territory of Guam v. Veloria*, 136 F.3d 648, 652 (9th Cir.1998). If those conditions are met, the appellate court may exercise its discretion to review an error "only if ... the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citing *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

Here, even if we assume that Mier committed perjury and the government knew of it, the prejudice to Cooper was not great. Cooper's attorney was able to impeach Mier extensively with inconsistent statements. There was no plain error.

### C. Immunity Agreement

 Cooper contends that the government improperly failed to disclose an immunity agreement with Mier. The government denies that it had an agreement with Mier.

 This court reviews de novo alleged violations of the government's obligation to disclose leniency agreements with prosecution witnesses. *United States v. Bracy*, 67 F.3d 1421, 1428 (9th Cir.1995); *see Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

As the defense established at trial, Mier's credibility was shaky at best. He faced potential criminal prosecution in the United States, so it seems unlikely that he would return to testify only because he wanted to tell the truth. This, however, is at most circumstantial evidence of an immunity agreement with Mier. A defendant must present more direct evidence of an agreement to justify reversal on this ground. *See United States v. Ramirez*, 608 F.2d 1261, 1266–67 (9th Cir.1979).

### III. Prosecutorial Misconduct

 Cooper contends that the prosecutor twice committed misconduct during closing argument. This court reviews claims of prosecutorial misconduct for plain error when the defendant did not object at trial, and for abuse of discretion when the district court denied an objection to closing argument. *United States v. Etsitty*, 130 F.3d 420, 424 (9th Cir.1997), *amended in part on other grounds*, 140 F.3d 1274 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998). Cooper must show that it is "'more probable than not that the misconduct materially affected the verdict.'"

*United States v. Peterson,* 140 F.3d 819, 821 (9th Cir.1998) (quoting *United States v. Hinton,* 31 F.3d 817, 824 (9th Cir.1994)).

In the first incident, the prosecutor stated during closing:

What else did [Cooper] admit to you? Well, he admitted that he knew that those invoices and weight tickets contained false statements.

(Pause)

He also admitted that he let known false statements be sent to the City of San Diego.

Defense counsel objected, contending that the prosecutor had misstated the evidence. The district court responded that the jury would make its own evaluation of the evidence.

When the prosecutor resumed her argument, she explained that the "false statements ... sent to the City" referred to Cooper's letter of resignation, which Cooper had admitted contained false statements. Cooper argues that he was prejudiced because the mail fraud counts were not based on the letter of resignation. The indictment, the evidence at trial, and final argument on the mail fraud counts all focused on the false weighmaster certificates, so the jury could not have been confused by this reference to the resignation letter. *See Hinton,* 31 F.3d at 824 ("The prosecution's alleged misconduct must be viewed in the context of the entire trial.").

The prosecutor's reference to Cooper's testimony on the weighmaster certificates is more troublesome. The prosecutor arguably implied that Cooper admitted knowing the weighmaster certificates were falsified *before* CCF mailed them to the City. The jury should not have been misled, however, because it heard Cooper testify emphatically that he never looked at the certificates before they were mailed, and that he did not learn the certificates were false until after the City questioned their validity. Any remaining prejudice was eliminated by the court's instruction.

Cooper also contends that the prosecutor committed misconduct when she argued that if a hypothetical "ecoterrorist" who ruptured a sewage pipe flowing into the ocean would be responsible for causing a violation of an NPDES permit, then Cooper should be responsible for causing a violation the City's permit by depositing sewage sludge on an unauthorized site. Defense counsel did not object.

Considered in context, the prosecutor's analogy was not out of line. She was attempting to refute Cooper's argument that a non-permittee may not be criminally liable for causing a violation of a permit. To the extent that the term "ecoterrorist" could be prejudicial, the prejudice was not so egregious as to seriously affect the fairness or integrity of the trial. *See United States v. Rewald,* 889 F.2d 836, 862 (9th Cir.1989) (prosecutor's reference to defendant as a nine-headed monster not misconduct), *amended in part on other grounds,* 902 F.2d 18 (9th Cir.1990).

## IV. Sentencing Issues

This court reviews the district court's findings of fact at sentencing for clear error. *United States v. Shannon,* 137 F.3d 1112, 1119 (9th Cir.) (per curiam), *cert. denied,* —— U.S. ——, 118 S.Ct. 2390, 141 L.Ed.2d 755 (1998). The court's application of the law to the facts is reviewed for abuse of discretion. *United States v. Barnes,* 125 F.3d 1287, 1290 (9th Cir.1997). This court reviews the district court's interpretations of the Sentencing Guidelines de novo. *United States v. Blitz,* 151 F.3d 1002, 1009 (9th Cir.), *cert. denied sub nom. Marie v. United States,* —— U.S. ——, 119 S.Ct. 567, 142 L.Ed.2d 473 (1998).

### A. Obstruction of Justice

The district court found that Cooper had willfully testified falsely on material facts, justifying a two-level enhancement for obstruction of justice. U.S.S.G. § 3C1.1 (citations are to the Nov. 1995 edition). At sentencing, the court stated that Cooper's testimony "didn't make any

sense—not only was he not convincing on it, but it didn't make any sense that it was all Vaughan and all Mier, and he didn't do anything, didn't know anything. . . . And then when you look in the right context, of all of those denials that he made, . . . it was clearly testimony on very material facts that was not. . . credible, was not accurate, was not truthful."

 The district court may enhance a sentence for obstruction of justice if the defendant's testimony was false, material, and willful. *Shannon*, 137 F.3d at 1119 (citing *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)). "Mere dispute or disagreement as to a defendant's perception of facts, without more, should not give rise to a charge of perjury in the context of sentencing." *Id.* at 1119 n. 3.

The district court saw Cooper testify and supported the obstruction of justice enhancement with the proper findings of fact. The record supports those findings. The two-level upward enhancement for obstruction of justice was not error.

### B. Discharge of a Pollutant

 The district court ruled that because the Clean Water Act defines sewage sludge as a "pollutant," 33 U.S.C. § 1362(6), Cooper should receive a six-level enhancement for discharging a pollutant. *See* U.S.S.G. § 2Q1.3(b)(1)(A) (enhancement for "ongoing, continuous, or repetitive discharge, release, or emission of a pollutant into the environment"). Cooper contends that the enhancement doesn't apply because the sewage sludge met the federal regulatory requirements for land application.

The district court was correct that the statutory definition of "pollutant" controls. The federal regulations on land application did not implicitly amend the statutory definition. *Cf. United States v. West Indies Transp., Inc.*, 127 F.3d 299, 315 (3d Cir. 1997) (rejecting contention that raw sewage was not a pollutant because it was fully biodegradable), *cert. denied*, — U.S. —, 118 S.Ct. 700, 139 L.Ed.2d 644

(1998). Under Cooper's direction, CCF dumped about 10,000 tons of uncomposted sewage sludge on the Mason farm. That dumping was "actual environmental contamination" as required by the guidelines. *See* U.S.S.G. § 2Q1.3 appl. n. 4; *United States v. Ferrin*, 994 F.2d 658, 664 (9th Cir.1993) (interpreting identically worded application note 5 to U.S.S.G. § 2Q1.2 and holding that "a finding that the hazardous waste came into contact with land . . . is the appropriate predicate for an enhancement"). The enhancement requires "actual environmental contamination," not actual environmental harm. *See Ferrin*, 994 F.2d at 664 (defining "contaminate" as " 'to soil, stain, or infect by contact or association' or 'to make . . . impure by admixture' ") (quoting *Webster's New Collegiate Dictionary* 245 (1977)); *United States v. Bogas*, 920 F.2d 363, 368 (6th Cir.1990) (concluding that enhancement under U.S.S.G. § 2Q1.2 applied even though "[t]here may have been no actual harm"). *Cf. Welch v. Board of Supervisors*, 888 F.Supp. 753, 756 (W.D.Va.1995) ("the regulations also make clear that land application of sewage sludge still carries with it some risks; it is, after all, a pollutant."). The background note to U.S.S.G. § 2Q1.3 explains that it "parallels § 2Q1.2 but applies to substances which are not pesticides and are not designated as hazardous or toxic." Thus the guideline applied here is for nonhazardous pollutants, and the parallel guideline is for designated hazardous pollutants. A substance therefore can be classified as a pollutant even though it is not designated as hazardous. That this sludge may have been class A, nonhazardous and permissible under appropriate conditions for application to farmland, does not avoid application of the guideline for nonhazardous pollutants.

### C. Permit Violation

 The district court applied a four-level enhancement for "a discharge . . . in violation of a permit." U.S.S.G. § 2Q1.3(b)(4). Cooper contends that the enhancement should not apply because he

was not required to secure a permit. This court rejected a similar argument in *Ferrin*, 994 F.2d at 664–65. Here, as in *Ferrin*, Cooper was convicted of a crime whose elements include violating a condition of a permit.

### D. Amount of Loss

 The presentence report calculated the intended loss caused by Cooper's conduct as $566,000, based on the amount of money CCF billed the City for shipments of sewage sludge to the Mason farm. The district court, which adopted both the presentence report's calculation of loss and an alternative calculation suggested by the prosecutor, imposed a ten-level enhancement for a loss of more than $500,000. U.S.S.G. § 2F1.1(b)(1)(K).

The Sentencing Guidelines define loss as "the value of money, property, or services unlawfully taken." U.S.S.G. § 2F1.1, appl. n. 7. "[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. § 2F1.1, appl. n. 8; *United States v. Watson*, 118 F.3d 1315, 1319 (9th Cir.1997). "[I]ntended loss is a proper measure to use in fraud cases." *Blitz*, 151 F.3d at 1009.

Cooper contends that CCF, not the City, lost money. He argues that because CCF did haul sludge from Fiesta Island, the City benefited from CCF's services. *See Blitz*, 151 F.3d at 1012 (because a defendant's services may have some value although part of a fraudulent scheme, the district court when calculating intended loss "should give credit for any legitimate services rendered to the victims").

The district court reasoned, however, that "removal is not the sine qua non of whether [Cooper] should be paid" because CCF was required to compost the sludge, and was not authorized to dump sludge wherever it pleased. The district court stated, "There has to be a procedure [for hauling sewage sludge] that complies with the law. And that's why [Cooper] gets paid a lot of huge dollars to remove this stuff." (An auditor testified that the City

paid CCF about $8 million over the two-plus years of the contract.)

In *United States v. Frank*, 156 F.3d 332, 335–36 (2d Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1257, 143 L.Ed.2d 353 (1999), the Second Circuit dealt with a similar issue. There, the defendants agreed to ship sewage sludge by barge and dump it at sea 106 miles from shore. Instead, the defendants dumped the sludge well short of the required distance, and sent falsified invoices. The defendants were convicted of mail fraud.

On appeal, the defendants argued that the evidence was insufficient because "the municipalities got precisely what they bargained for-sludge disposal-and that, accordingly, the [defendants] neither intended nor caused the municipalities any harm." *Id.* at 335. The Second Circuit rejected this argument, reasoning that the defrauded municipalities paid defendants a premium for the full 106–mile transport, and that the defendants' "short-dumping" could have subjected the municipalities to fines and the loss of permits.

Here, CCF's removal of sludge from Fiesta Island had some value to the City, but that value was offset by the harm caused by CCF's failure to compost and legally dispose of the sludge. CCF's actions exposed the City to potential cleanup liability and to the loss of its NPDES permit. *See* 33 U.S.C. §§ 1319, 1342(b)(7) (permit holder subject to enforcement action for failure to comply with conditions of permit). These costs, while almost impossible to quantify, cannot be dismissed as phantoms. The district court noted that the City

should be able to control where [the sewage sludge is] going to go—so [the City doesn't] get stuck with that legal mess—the time, the energy, the legal fees, and the bad publicity . . .—can you imagine how the people of Imperial [County] would feel if they are told that the City is illegally dumping its sewage waste on their farmland? All sorts of political problems.

The district court faced a daunting task in attempting to calculate the amount of the City's loss. Using the invoiced amount for the shipments of sludge to the Mason farm was in this case a reasonable, if rough, estimate of the intended loss. We cannot say that the district court's calculation was clearly erroneous.

### E. More Than Minimal Planning

■ The district court applied a two-level enhancement for more than minimal planning. U.S.S.G. § 2F1.1(b)(2)(A). At sentencing, the court stated, "this was an ongoing scheme to submit false weighmaster certificates to the City. It was extensive. It was sophisticated."

" 'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, appl. n. (f). The district court did not clearly err in applying the enhancement.

### F. Role in the Offense

■ The district court applied a two-level enhancement because of Cooper's role in the offense as a leader, manager, or supervisor. U.S.S.G. § 3B1.1. The court found that Cooper owned half of CCF, would have benefited more than others from the offense, knew about the CCF's day-to-day activities, and located a farmer to accept sludge.

■ When a defendant supervises other participants, he need exercise authority over only one of the other participants to merit the adjustment. *United States v. Camper*, 66 F.3d 229, 231 (9th Cir.1995) (citing *United States v. Barnes*, 993 F.2d 680, 685 (9th Cir.1993)). Here, the evidence supported the district court's finding that Cooper supervised at least one other participant. *Cf. United States v. Lopez-Sandoval*, 146 F.3d 712, 717 (9th Cir.1998).

The court did not err in applying the enhancement.

AFFIRMED.