# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BLUFFORD HAYES, JR.,
        *Petitioner-Appellant,*

v.

JILL BROWN, Warden of the
California State Prison at San
Quentin,*

        *Respondent-Appellee.*

No. 99-99030

D.C. No.
CV-92-00603-
GGH P

OPINION

Appeal from the United States District Court
for the Eastern District of California
David F. Levi, District Judge, Presiding

Argued June 6, 2002
Submitted June 14, 2002
Filed August 26, 2002
Opinion Vacated and Rehearing En Banc Granted
August 26, 2004
Argued and Re-submitted En Banc
October 12, 2004

Filed March 7, 2005

Before: Mary M. Schroeder, Chief Judge, and
Andrew J. Kleinfeld, Sidney R. Thomas, Susan P. Graber,
Kim McLane Wardlaw, William A. Fletcher,
Raymond C. Fisher, Ronald M. Gould, Richard A. Paez,
Richard C. Tallman, and Jay S. Bybee, Circuit Judges.

*Pursuant to Fed. R. Civ. P. 43(c)(2), we *sua sponte* substitute Jill
Brown for Jeanne Woodward as the respondent in this action.

Opinion by Judge Thomas;
Partial Concurrence and Partial Dissent by Judge Tallman

## COUNSEL

David A. Senior, McBreen & Senior, Los Angeles, California, argued the cause for the petitioner-appellant; Kathleen T. Saenz, McBreen & Senior, Los Angeles, California, was on the briefs.

Mathew Chan, Deputy Attorney General, Sacramento, California, argued the cause for the repondent-appellee; Bill Lockyer, Attorney General, Robert Anderson, Chief Assistant Attorney General, Jo Graves, Senior Assistant Attorney General, Arnold O. Overoye, Senior Assistant Attorney General, Ward A. Campbell, Supervising Deputy Attorney General, and Carlos A. Martinez, Supervising Deputy Attorney General, were on the brief.

## OPINION

THOMAS, Circuit Judge:

In this case, we consider whether a prosecutor's knowing presentation of false evidence and failure to correct the record violate a criminal defendant's due process rights. We conclude that such actions violate due process, and we therefore reverse the district court's denial of the petition for a writ of habeas corpus.

I

This case concerns the 1980 murder of Vinod "Pete" Patel by Blufford Hayes, Jr. Patel was the resident hotel manager of the Rice Motel in Stockton, California. Hayes was staying

in Room 15 of the motel with his sister, Barbara Lord. Hayes once resided at the motel himself, but had been evicted when he stopped paying rent. Several days before Patel's death, Patel had asked the police to arrest Hayes for trespassing because he had broken into his former room. Officers found Hayes in his former room with fresh needle marks on his arm; he admitted to breaking in, but said he intended to pay rent as soon as he could. The police arrested him for trespassing and for being under the influence of a controlled substance.

Hayes returned to the Rice Motel on New Year's Eve, December 31, 1979, to visit his sister in her room. Hayes testified that, as of New Year's Eve, he had been awake for three days, had injected heroin and Ritalin, and had consumed a large amount of brandy. On the morning of New Year's Day, Lord left for work, leaving Hayes alone in the motel room. At trial, Lord testified that her bathroom sink had been leaking for some time. She had told Patel about the leak, but he had not fixed it. Lord testified that she saw Patel as she left for work on the morning of New Year's Day, and that she may have mentioned the leak to him again.

At around 9:30 a.m., Bearla Mae Wyatt, who lived next door to Lord in Room 16, went to the motel's office to get some fresh towels. In the office, Wyatt encountered Hayes and Patel. Hayes was telling Patel that there was a problem with the bathroom sink in Room 15 and that he wanted Patel to come and fix it. Patel did not understand Hayes's explanation and invited Hayes to demonstrate what he meant in Patel's own living quarters, which adjoined the office. Because Patel was occupied, Wyatt left; when she returned 10 to 15 minutes later, Hayes and Patel were coming out of Patel's bathroom area. Wyatt heard Patel tell Hayes that he would "be down at the room later on."

Hayes testified that, after his discussion with Patel at the motel office, Hayes returned to Room 15, went to a store to buy a bottle of wine, returned to the motel room, drank some

wine, and went to sleep. According to Hayes, the next thing he recalled was being awakened by someone slapping him and saying something that he could not understand. He claimed that he struck back and thereafter realized it was Patel. Hayes testified that, as he was getting off the bed, he noticed that Patel had a knife. Hayes said he struggled with Patel, forced Patel to drop the knife, and then picked the knife up himself.

Hayes testified that he thereafter tried to stop the manager from grabbing a butcher knife that was on top of the dresser, and ended up stabbing Patel on the arm and chest. According to Hayes, Patel backed away into the bathroom and made a loud noise. Patel then walked out and collapsed on the floor. Hayes said he then picked up the butcher knife from the floor and put it in a dresser drawer to put it outside Patel's reach. He also picked up a bottle of wine and placed it into the same drawer. Hayes righted a chair that had been knocked over and picked up a pouch and vest from the floor and put them on the bed. He then unwound two wire coat hangers and bound Patel's hands and feet while Patel was still alive. Hayes explained that he did not want to have to hurt Patel anymore and was afraid of what Patel might do if he got up.

A short time later, Hayes went to the motel room shared by Andrew "A.J." James and his girlfriend, Michele Gebert. Hayes had known both James and Gebert for many years. Hayes told them he wanted James to give him a ride. Hayes testified that he told James that he had had to "down" someone. James said that he did not believe Hayes, and left the room to see for himself. Gebert testified that she commented to Hayes about the possibility of Patel calling the police, and Hayes allegedly replied that "[Patel] would not say anything to anybody." Hayes testified that he looked out the door of James and Gebert's apartment and saw James, not in Hayes's room, but at the motel office. According to his testimony, Hayes then went to the office, where he saw James taking cartons of cigarettes. Hayes testified that, at James's request, he

also carried two boxes himself. Hayes and James left together in James's car.

Wyatt testified that, about thirty minutes after she saw Hayes and Patel in the motel office, by which time she had returned to her room, she looked out her window and saw Hayes carrying a box across the motel parking lot to a car. She noticed that James was standing at the side of the car. A few moments later, she looked out the window again and saw James carrying something out of his room. She could not recall what James was carrying, but it "seemed like he was moving out" because there was a lot of movement back and forth.

According to James, when Hayes arrived at James's room, James woke up, went to the bathroom, and left with Hayes. James testified that the two went to James's car. There, James noticed that two boxes of cigarettes, each containing thirty cartons, were in the car. The location of the boxes is unclear. At one point, James testified that the boxes of cigarettes were in the trunk. At other times, James testified that the boxes were in the back seat. According to James, Hayes asked James if he knew where to get rid of the cigarettes, but James said he did not. James kept one carton for himself, however.

James testified that Hayes told him in the car that Hayes had "offed" the motel manager. When James expressed his disbelief, Hayes explained that the manager had awakened him and had "swung on him" so Hayes "did the do with him." James also testified that Hayes further advised James that he "tore" up the office looking for money. James drove Hayes to Hayes's mother's house, helped unload the cigarettes, and then drove straight back to the motel, where he noticed that the door of the motel's office was open. He left in the car with Gebert, and they drove around for several hours discussing what to do. James was afraid to go to the police because he "had cases at the time." Gebert eventually called the police,

and Gebert and James later went to the police station to be interviewed.

When Lord returned to Room 15 that afternoon, she found Patel's dead body lying on the floor. His hands and feet were bound with coat hangers. Patel had suffered at least twenty-two cutting and stabbing wounds, including eight stab wounds to the front of his chest. Six stab wounds penetrated the chest cavity, any one of which could have been fatal. The wounds to Patel's left hand and forearm were determined to be "defensive wounds," which the coroner defined as "wounds incurred by the victim as he is trying to ward off the attacker."

At the crime scene, the police located a butcher's knife inside a dresser drawer. Inside the bathroom, the police found "splattered" blood on "quite a few spots." There were also signs of struggle inside the bathroom, as reflected by a toppled plastic trash can and damage to the door frame of the shower. Outside the bathroom, the only blood observed was a pool under Patel's body, and stains on some items on the bed. There was no overturned furniture in the room, according to a police officer who viewed the scene. The police also discovered a light blue, long-sleeved shirt and a dark blue vest, both stained with blood. Hayes and Patel had the same blood type, and the blood on the clothing was consistent with this type. The motel's office and Patel's adjoining living quarters appeared to have been ransacked. The office cash box, which generally held $40 to $50, was found empty.

Hayes was arrested in Oregon, and tried before a San Joaquin County, California, jury. The prosecution flew James, who had left California, back from Florida for the trial, with the promise that he could return to Florida after testifying. James had a criminal history, having been convicted of petty theft, grand theft, and receiving stolen property. At the time he testified, he also had pending in California three charges of felony theft with a prior conviction, and a charge of being under the influence of heroin. Before trial, the prosecutor had

reached an agreement with James's attorney to grant transactional immunity for the Patel killing and to dismiss the other pending unrelated felony charges against James. However, the State wished to keep the promise to dismiss the felony charges away from the trial judge and jury. Therefore, the prosecutor extracted a promise from James's attorney that he would not tell James about the deal. The idea was that James would be able to testify that there was no deal in place, without perjuring himself, because James would not personally be informed of the arrangement.

The jury convicted Hayes of first-degree murder (Cal. Penal Code § 187), burglary, and robbery, and it found true the two special circumstances of robbery-murder and burglary-murder. Cal. Penal Code § 190.2(a)(17)(A)&(G). On November 25, 1981, the same jury returned a verdict imposing a death sentence.

After he testified, James returned to Florida with an airplane ticket paid for by the prosecution, even though the California felony charges were still pending, and he had not been arraigned. Shortly thereafter, the State dismissed all felony charges against James.

Hayes appealed from the conviction and sentence to the California Supreme Court, which reversed the conviction and sentence for robbery, and the robbery-murder special circumstance, but otherwise affirmed the judgment, including the imposition of the death penalty. *People v. Hayes*, 802 P.2d 376 (Cal. Sup. Ct. 1990).

In June 1993, Hayes filed a federal petition for a writ of habeas corpus consisting of 61 claims. The district court dismissed 38 unexhausted claims, without prejudice, and ordered Hayes to present the claims to the California Supreme Court. Hayes filed those claims, and five additional claims, in a second petition for writ of habeas corpus in the California Supreme Court. That court denied all relief.

Hayes then filed a first amended petition in federal court on August 28, 1995, asserting 65 claims. The State of California moved to dismiss some of the claims on the ground that they were denied by the California Supreme Court on procedural grounds, thereby barring federal review. The motion was denied. A four-day evidentiary hearing was conducted on Hayes's allegedly unconstitutional absence from the entire penalty phase of the trial, and a separate two-day evidentiary hearing was conducted regarding the alleged ineffective assistance of counsel regarding a plea-bargain offer.

Both parties moved for summary judgment on the merits, and the magistrate judge recommended that the State's motion for summary judgment be granted as to all claims and that the habeas petition be denied. After de novo review, the district court filed an order specifically addressing some of Hayes's claims, adopting the magistrate judge's findings and recommendations in full, and denying the petition. The district court granted Hayes a certificate of appealability for the arguments he makes on appeal. A divided panel of our Court issued an opinion affirming the district court's grant of summary judgment. A majority of the non-recused, active judges of this Court voted to rehear the appeal en banc.

Hayes filed his 28 U.S.C. § 2254 petition for a writ of habeas corpus before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, our review is governed by pre-AEDPA standards. *See, e.g., Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Karis v. Calderon*, 283 F.3d 1117, 1126 n.1 (9th Cir. 2002).

> On habeas review, state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution.

*McKenzie v. McCormick*, 27 F.3d 1415, 1418 (9th Cir. 1994) (citation and quotation marks omitted).

## II

The Supreme Court has long emphasized "the special role played by the American prosecutor in the search for truth in criminal trials." *Strickler v. Greene*, 527 U.S. 263, 281 (1999). As we observed in *Commonwealth of The Northern Mariana Islands v. Mendiola*, 976 F.2d 475, 486 (9th Cir. 1992) (citations omitted), *overruled on other grounds by George v. Camacho*, 119 F.3d 1393 (9th Cir. 1997) (en banc):

> The prosecuting attorney represents a sovereign whose obligation is to govern impartially and whose interest in a particular case is not necessarily to win, but to do justice. . . . It is the sworn duty of the prosecutor to assure that the defendant has a fair and impartial trial.

[1] One of the bedrock principles of our democracy, "implicit in any concept of ordered liberty," is that the State may not use false evidence to obtain a criminal conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citation omitted). Deliberate deception of a judge and jury is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). Thus, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269 (citations omitted). "Indeed, if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic.' " *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (quoting *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir. 1975)).

[2] In addition, the state violates a criminal defendant's right to due process of law when, although not soliciting false

evidence, it allows false evidence to go uncorrected when it appears. *See Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213 (1942).

A

In this case, the State knowingly presented false evidence to the jury and made false representations to the trial judge as to whether the State had agreed not to prosecute James on his pending felony charges. James's attorney testified in federal court that there had been a deal between himself and then-Deputy District Attorney Terrence Van Oss. The district court specifically found:

> The record amply supports the magistrate judge's finding that Van Oss and James' attorney reached an agreement addressing the felony charges prior to Hayes' first preliminary hearing on February 7, 1980.

The district judge noted that, in a file entry dated February 7, 1980, James's attorney wrote:

> Van Oss s[ai]d [he] didn't want to make [a] deal on this case on [the] record, but will guarantee that [James'] O.R. [own recognizance release] will be reinstated. He wants to keep case felony for now so if [James] splits they can extradite. After Hayes over, [James] can P[lead] G[uilty] to misd[emeanor] for straight prob[ation] — no jail.

(Material in brackets supplied by district court.)

The district court noted that "[s]ubsequent entries state that 'the case will be disposed of after Hayes trial' and 'case to be dismissed on 12/15/81.' " The district court also found that, "[i]n an evidentiary hearing in another case, Van Oss testified

that he had no basis for disputing these notes, conceding at one point that he 'must have told him.' "

In his Report and Recommendation, the magistrate judge stated:

> [T]he court finds that the prosecutor [ ] tacitly admitted in an evidentiary hearing in another case that he had made some type of agreement with James' lawyer for the 1980 arrests at or about the time that James appeared at his arraignment.

This finding is amply supported by the record. Although felony charges against James were pending, the State assisted him in moving to San Diego. James later moved to Florida. The government paid for his airplane transportation from Florida to California to testify in the Hayes trial. James freely traveled to California, apparently without fear that he would be placed in custody on the pending felony charges. The notes from James's attorney indicate that a court appearance on his charges was scheduled for October 20, 1981, but was continued until November 17, 1981. James testified at the Hayes trial on October 29, 1981. The jury returned a guilt-phase verdict on November 16, 1981. The next day, the chief prosecutor in the Hayes trial, Terrence Van Oss, appeared at the continued arraignment scheduled for James. The transcript of the hearing reflects there was a discussion off the record with the judge, after which the arraignment was continued until December 15, 1981. James's counsel's notes on November 17, 1981, said that "case to be dism[issed] on 12/15/81. We need *not* appear." The jury returned its verdict of punishment by death on November 25, 1981. On December 15, 1981, the charges against James were dismissed, and the State paid for James's safe return to Florida by air.

In addition to the fact of the deal, the record also supports the finding that a key part of the agreement was to keep James in the dark, so that he could testify that there was no deal

without perjuring himself. James's attorney wrote in his notes of the conversation about the deal:

> D.A. rec. O.R. [own recognizance] on this. Van Oss is guy to see. This guy is a witness against Blufford Hayes on the 187 p.c. at the Rice Motel on 1-1-80. THIS IS SECRET INFO!! *Don't tell the client*, or let the word out, or this guy will be a goner!!

(Emphasis in original.)

After making this arrangement, the State misled the trial judge. In preliminary proceedings, defense counsel inquired "whether any negotiated settlement has been made in return for his [James's] testimony." To that, the prosecutor responded:

> There has been absolutely no negotiations whatso-ever in regard to his testimony. No promises, no discussions about this other offense at all.

Upon further inquiry by the trial judge about "whether there has been any negotiations," the prosecutor replied:

> That was asked of Mr. James at the time of the preliminary examination and he testified that there had been absolutely no promises and no discussions in regard to any pending charges and that is the status of the case. There has been no discussions in regard to any pending charges.

When James testified, the prosecutor elicited the following testimony:

> Q. All right. Other than these things that you have told us about, have you been made any promises? Have you been offered anything? Has any pressure

been put on you? Has anything been done to make you testify here?

A.   No.

After defense counsel probed in cross-examination the lack of activity in prosecuting James, with James responding that the charges were still pending, the prosecutor elicited the following testimony from James on redirect:

Q.   You and I have discussed the fact that you have other charges pending; isn't that correct?

A.   Right.

Q.   Okay. And you would tell the jury what if anything of any deals or any promises or anything else has been made in regards to this charge?

A.   No. There are still pending, you know . . . . You know, I didn't get no — you know, like they try to make it sound like a deal or something. It wasn't like that, man. I just don't want no involvement, you know.

In closing, the prosecutor emphasized the truthfulness of the State's witnesses, stating:

The implication is that somehow all the prosecution's witnesses are lying and the only person that is telling the truth in this case is the defendant. I ask you, is that reasonable? Is that the sort of reason the Court is asking you to use when it tells you that you must use the standard of reasonable doubt in this case? That somehow everybody is lying, but the defendant?

That's not the reason and that's not the standard of proof in this case. Andrew James may be a very bad

man, he may have a bad past, he is not a murderer
as the defendant is in this case.

**[3]** Thus, the record is clear that: (1) before the Hayes trial,
the State had made a deal with James's attorney for the dis-
missal of pending felony charges after his testimony; (2) the
State specifically represented to the trial judge that there was
no such deal; (3) the State elicited sworn testimony from
James at trial that there was no such deal, both on direct and
re-direct examination; and (4) the State failed to correct the
record at trial to reflect the truth.

**[4]** The State's actions violated Hayes's constitutional
rights first under *Napue*, by presenting false evidence to the
jury and, second, under *Alcorta* and *Pyle*, by failing to correct
the record following the presentation of false evidence.

B

The State contends that there was no *Napue* violation
because James did not commit perjury. According to the
State, *Napue* renders unconstitutional only acts of perjury.
Therefore, the State reasons, because James was ignorant of
the deal, he did not commit perjury and the State did not run
afoul of *Napue*. In short, the State contends that it is constitu-
tionally permissible for it knowingly to present false evidence
to a jury in order to obtain a conviction, as long as the witness
used to transmit the false information is kept unaware of the
truth.

**[5]** The State is wrong. *Napue*, by its terms, addresses the
presentation of false *evidence*, not just subornation of perjury.
As Chief Justice Warren wrote:

> [I]t is established that a conviction obtained through
> use of false evidence, known to be such by represen-
> tatives of the State, must fall under the Fourteenth
> Amendment.

360 U.S. at 269 (citations omitted). In describing the rule, the Court itself discussed the use of "false evidence, including false testimony. . . ." *Id.* There is nothing in *Napue*, its predecessors, or its progeny, to suggest that the Constitution protects defendants only against the knowing use of perjured testimony. Due process protects defendants against the knowing use of any false evidence by the State, whether it be by document, testimony, or any other form of admissible evidence. *See Phillips v. Woodford*, 267 F.3d 966, 984-85 (9th Cir. 2001) ("It is well settled that the presentation of false evidence violates due process.") (citing *Napue*, 360 U.S. at 269).

Further, contrary to the State's theory, that the witness was tricked into lying on the witness stand by the State does not, in any fashion, insulate the State from conforming its conduct to the requirements of due process. As our court noted in *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1114 (9th Cir. 2001): "Few things are more repugnant to the constitutional expectations of our criminal system than covert perjury . . . ." It is reprehensible for the State to seek refuge in the claim that a witness did not commit perjury, when the witness unknowingly presents false testimony at the behest of the State. "This saves [the witness] from perjury, but it does not make his testimony truthful." *Willhoite v. Vasquez*, 921 F.2d 247, 251 (9th Cir. 1990) (Trott, J., concurring). The fact that the witness is not complicit in the falsehood is what gives the false testimony the ring of truth, and makes it all the more likely to affect the judgment of the jury. That the witness is unaware of the falsehood of his testimony makes it more dangerous, not less so.[1]

**[6]** There is nothing redemptive about the sovereign's conspiring to deceive a judge and jury to obtain a tainted convic-

---

[1] We assume for purposes of our analysis that James was, in fact, unaware of the secret deal. But we note the distinct risk that, in preparing James for his testimony, James's counsel — who did know about the deal — might have influenced the content of that testimony, deliberately or not.

tion. This is, as Judge Trott put it, "a pernicious scheme without any redeeming features." *Id. Napue* forbids the knowing presentation of false evidence by the State in a criminal trial, whether through direct presentation or through covert subornation of perjury.[2]

**[7]** Further, the argument that the presentation of false testimony, carefully orchestrated to avoid perjury, does not offend the Constitution flies in the face of *Alcorta* and *Pyle* because those cases create an affirmative duty on the part of the prosecution to correct false testimony at trial, even when the testimony is unsolicited. There is no exception under *Alcorta* and *Pyle* for solicited false testimony. The State's knowing presentation of false evidence and failure to correct the record at Hayes's trial violated the Fourteenth Amendment.

### C

**[8]** The State argues that the constitutional prohibition against the knowing presentation of false evidence, as distinguished from the prohibition against suborning perjury, is a new rule of constitutional procedure that cannot be applied to this case under *Teague v. Lane*, 489 U.S. 288 (1989). Subject to a few exceptions, *Teague* holds that, "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Id.* at 310.

The threshold question in a *Teague* analysis is whether the rule that the petitioner seeks to apply is a substantive rule or a procedural rule, because "*Teague* by its terms applies only to procedural rules." *Bousley v. United States*, 523 U.S. 614, 620 (1998). If the rule is procedural, the court then conducts a three-step analysis to determine whether *Teague* bars its

---

[2]To the extent that any of our prior case law, including *Willhoite*, suggests otherwise, those cases are overruled.

application. *See O'Dell v. Netherland*, 521 U.S. 151, 156-57 (1997). First, the reviewing court "must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes." *Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). Second, the court must survey "the legal landscape as it then existed," *Graham v. Collins*, 506 U.S. 461, 468 (1993), to determine whether existing precedent compelled a finding that the rule at issue "was required by the Constitution." *Lambrix v. Singletary*, 520 U.S. 518, 527 (1997) (internal quotation marks and citations omitted). If existing precedent already required application of the rules, the *Teague* bar does not apply. However, if the procedure at issue is considered a new rule for *Teague* purposes, the court must proceed to the third step and determine whether either of the two announced exceptions applies. *Teague*, 489 U.S. at 307. The presumption against retroactivity is overcome only if the new rule prohibits "a certain category of punishment for a class of defendants because of their status or offense," *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002), or presents a new "watershed rule[ ] of criminal procedure" that enhances accuracy and alters our understanding of bedrock procedural elements essential to the fairness of a particular conviction. *Teague*, 489 U.S. at 311 (citations omitted).

**[9]** Thus, we must first ask whether the prohibition against the knowing presentation of false evidence is substantive or procedural law. For *Teague* purposes, a new rule is one of "procedure" if it affects the operation of the criminal trial process, and a new rule is one of "substance" if it alters the scope or modifies the applicability of a substantive criminal statute. *Bousley*, 523 U.S. at 620. The prohibition on the use of false evidence by the State at trial is clearly a procedural rule; it affects the operation of the criminal trial process, but does not affect the scope of a substantive criminal statute.

Because the rule is procedural, we proceed to the three-step analysis to determine whether the rule was "new." We begin

by ascertaining the date on which Hayes's conviction became final. *Caspari*, 510 U.S. at 390. In 1990, the California Supreme Court upheld Hayes's conviction in relevant part. *People v. Hayes*, 802 P.2d 376 (Cal. 1990). The United States Supreme Court denied Hayes's petition for a writ of certiorari on November 12, 1991. *Hayes v. California*, 502 U.S. 958 (1991). Thus, Hayes's conviction became final on that date. *See Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987) ("By 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.") (citations omitted).

Next, we survey "the legal landscape as it then existed," *Graham*, 506 U.S. at 468, to determine whether existing precedent compelled a finding that the rule at issue "was required by the Constitution." *Lambrix*, 520 U.S. at 527. The suggestion by the State that, as of 1991, the Constitution did not prohibit the government from knowingly presenting false evidence to obtain a criminal conviction is somewhat startling. There is nothing new at all about this constitutional protection. We have already noted that *Napue*, decided nearly a half century ago, specifically addressed "false evidence," and was not limited to barring the subornation of perjury. *Alcorta* and *Pyle,* which require the State to correct false facts introduced as evidence at trial, were decided in 1957 and 1942, respectively. Indeed, as we stated in *Bowie*:

> Because of the gravity of depriving a person of liberty on the basis of false testimony, the Supreme Court and the United States Courts of Appeal have fashioned over the years a workable set of precise rules designed not only to remedy egregious wrongs that have already occurred, but also prophylactically to prevent damaging false testimony from happening in the first place.

236 F.3d at 1087.

The rule originated with *Mooney* in 1935, which held that a criminal defendant is denied due process when the "state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." 294 U.S. at 112. Seven years later, in *Pyle*, the Supreme Court expanded this rule to encompass not only "perjured testimony, knowingly used by the State," but also "the deliberate suppression by those same authorities of evidence favorable to [the criminal defendant]." 317 U.S. at 216.

*Alcorta*, decided in 1957, involved a case quite similar to the one at bar. In that case, the Court was confronted with a prosecutor who, on direct examination, knowingly allowed a witness to create a false impression. 355 U.S. at 29-30. The prosecutor had instructed the witness not to volunteer what the prosecutor thought might be damaging information and then sat mute while the witness committed perjury. *Id.* at 31. In granting Alcorta's petition for a writ of habeas corpus, the Court held that the false impression given to the jury by the prosecutor and the State violated Alcorta's right to due process. *Id.*

*Napue*, which we have discussed, was decided two years later. *Napue* quoted with approval a decision from the New York Court of Appeals involving false testimony from a witness who had been given substantial consideration for his testimony, in which that court stated: " 'A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth.' " 360 U.S. 264, 269-70 (1959) (quoting *People v. Savvides*, 136 N.E.2d 853, 854-55 (N.Y. Ct. App. 1956)).

In *United States v. Bagley*, 473 U.S. 667, 678 (1985), the Supreme Court noted the "well-established rule that 'a conviction obtained by the knowing use of perjured testimony is

fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " (Citation omitted).

**[10]** Thus, the rule has been clear for decades: a criminal defendant is denied due process of law when a prosecutor either knowingly presents false evidence or fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial. We need not proceed to the remainder of the *Teague* analysis. There being nothing new about this rule, it does not implicate *Teague*.

### III

### A

**[11]** That constitutional error occurred does not end our analysis. Neither *Napue* nor *Acorta* creates a *per se* rule of reversal. Because the error was not structural, we must assess whether the constitutional violation was material. *See United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003) ("To prevail on a claim based on *Mooney-Napue*, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material.") (citations omitted).

In assessing materiality under *Napue*, we determine whether there is " 'any reasonable likelihood that the false testimony could have affected the judgment of the jury;' " if so, then "the conviction must be set aside." *Belmontes v. Woodford*, 350 F.3d 861, 881 (9th Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). Under this materiality standard, " '[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " *Hall v. Director of Corrections*, 343 F.3d 976, 983-

84 (9th Cir. 2003) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Even though this case comes to us on habeas review, we do not conduct an additional harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which asks whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 623 (citation omitted). When the Supreme Court has declared a materiality standard, as it has for this type of constitutional error, there is no need to conduct a separate harmless error analysis. As the Supreme Court explained in *Kyles*, when considering a similar question about applying the *Bagley* disclosure requirements, the required finding of materiality necessarily compels the conclusion that the error was not harmless. 514 U.S. at 435.

Application of the *Agurs* "any reasonable likelihood" standard necessarily forecloses a *Brecht* harmless error analysis. The Supreme Court noted in *Kyles* that, in *Agurs*, the Court had expressly considered and rejected the harmless error standard established in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), which formed the basis for the standard enunciated in *Brecht*. Therefore, the Court reasoned in *Kyles*, for all errors that derived from the *Agurs* materiality standard, there was no need to conduct a separate *Brecht* analysis. *Kyles*, 514 U.S. at 436. Thus, for example, because the prejudice analysis in *Strickland v. Washington*, 466 U.S. 668 (1984), derived from the *Agurs* materiality standard, federal courts do not conduct a separate *Brecht* analysis in ineffective assistance of counsel claims. *Kyles*, 514 U.S. at 436; *see also Pirtle v. Morgan,* 313 F.3d 1160, 1169 (9th Cir. 2002); *Avila v. Galaza*, 297 F.3d 911, 918 n.7 (9th Cir. 2002); *Jackson v. Calderon*, 211 F.3d 1148, 1154 n.2 (9th Cir. 2000).

Applying the same logic, we concluded in *Belmontes* that the *Agurs* standard applies to *Napue* claims. 350 F.3d at 881. Thus, once we have determined whether the *Napue* error was

material under the *Agurs* standard, we do not conduct a separate *Brecht* examination. The materiality analysis is complete in itself; there is no need for a separate harmless error review.

B

The remaining question in this case is whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Belmontes*, 350 F.3d at 881-82. The jury convicted Hayes of the charge of first-degree murder under a felony murder theory, finding Hayes "guilty of a violation of Section 187 of the Penal Code of the State of California, to-wit: murder, in the first degree, committed while the defendant was engaged in the commission of . . . a burglary."[3] The jury found true the special circumstance that Hayes committed a murder while "engaged in the commission of, or the immediate flight after committing burglary, a felony."[4]

[12] To convict Hayes of felony murder, the jury had to decide whether Hayes murdered Patel "as a result of the commission of" a burglary. Thus, a pivotal question before the jury was whether Hayes had formed the intent to burglarize the office before killing Patel. The State's theory was that Hayes had lured Patel into the motel room for the purpose of murdering him so that Hayes could burglarize the motel's

---

[3]The jury received two first degree murder instructions. The jury was first instructed that "[a]ll murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree." The jury was also instructed as to felony murder, as follows: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of the crimes of robbery and/or burglary and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree."

[4]The jury also found that Hayes committed murder during the commission of a robbery. However, the California Supreme Court overturned the robbery-murder conviction and the robbery special circumstance.

office. Hayes's theory was that a spontaneous fight occurred when Patel arrived at the motel room. Hayes contended that James was the one who initiated the office burglary after Hayes had come over to James's room to get a ride away from the motel after the killing.

[13] Thus, by any measure, James was a key witness. Indeed, there is little doubt that James's testimony was the centerpiece of the prosecution's case. Nearly all of the other evidence against Hayes was circumstantial. James was the only witness who testified that Hayes confessed to the murder and the burglary. The importance of this testimony cannot be understated. As the Supreme Court has observed: "A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J., dissenting)).

[14] Most importantly, James's testimony was critical to the State's burglary case, which was essential to both the first-degree murder conviction and the sentence. James testified that he went directly to his car without going to the office, that he did not participate in the burglary, and that the stolen property had already been placed in the car by Hayes. Hayes testified that he told James that he had killed Patel, that James went to investigate, and that Hayes next saw James burglarizing the office. Hayes's version of events was partially corroborated by another occupant of the motel, Bearla May Wyatt, who testified that she saw James carrying things to Hayes's car, "like he was moving out of an apartment." The only witness other than James who testified that Hayes had spoken about a burglary was James's girlfriend, Michele Gebert. However, she provided contradictory and confusing testimony, first denying on direct examination that Hayes had said anything about burglarizing the office, then testifying on redirect that he had. Most of Gebert's information came from James, and she provided her version of events only after she

and James had discussed it for many hours, deciding what to do.

The importance of James's testimony was underscored by the prosecution in its closing argument, as it was in the defense closing. As defense counsel put it: "In this case, you can only conclude that Blufford committed a robbery or a burglary if you believe Andrew James beyond a reasonable doubt."

In sum, James's testimony and credibility were crucial to the State's case. Without it, there was only circumstantial evidence of the burglary, and only inference as to whether Hayes killed Patel "as a result of the commission of" a burglary. That, coupled with the testimony about James's moving items to the car, easily "could have affected the judgment of the jury." *Belmontes*, 350 F.3d at 881 (citation and internal quotation marks omitted). Thus, under *Napue* and *Alcorta*, the false evidence presented was material to both the murder conviction and the imposition of the death penalty, and the habeas petition must be granted.

That the false evidence presented by the State dealt only with credibility does not change the materiality calculus. Noting that "[i]t is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt," 360 U.S. at 269 (internal quotation marks omitted), the Supreme Court stated in *Napue*:

> The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testi-

fying falsely that a defendant's life or liberty may
depend.

*Id.* In *Giglio v. United States*, 405 U.S. 150 (1972), the
Supreme Court reversed a conviction for *Mooney-Napue* error
because the State had failed to disclose a promise made to its
key witness that he would not be prosecuted if he testified for
the government. *Id.* at 154-55.

It also does not matter that James was subject to impeach-
ment on the basis of his transactional immunity, drug addic-
tion, and criminal record. As the Supreme Court noted in
*Napue*:

> [W]e do not believe that the fact that the jury was
> apprised of other grounds for believing that the wit-
> ness . . . may have had an interest in testifying
> against petitioner turned what was otherwise a
> tainted trial into a fair one.

360 U.S. at 270. For the jury's determination of James's cred-
ibility, James's past criminal record and drug history were of
little import, given that Gebert, Hayes, and James were all
drug users with clouded histories. James's credibility was
measured in comparison to his peers. James's transactional
immunity was of no value because there was never any dan-
ger or suggestion that James would be charged in connection
with this case. Unbeknownst to the jury, what was critical to
James was immunity from prosecution for the pending felony
charges. That was the factor that had made James reluctant to
talk to the police in the first instance. Although James was not
expressly told of the deal, it is quite evident that James should
have known that something was afoot, because it was other-
wise not logical for him to agree to be flown from Florida vol-
untarily into a jurisdiction in which he was facing outstanding
charges. Yet, thanks to the careful machinations of the prose-
cution, James could deny the existence of any deal.

The disclosure of an additional, secret deal would not have been merely cumulative impeachment. It would have demonstrated that the State was going to great lengths to give James a powerful incentive to testify favorably, to the point of letting him go free on unrelated felony charges. Presumably, the importance to the State's case of James's testimony is what initially led the prosecution to make the secret deal; likewise, the importance to James's credibility of his false testimony regarding the absence of a deal is what led the prosecution to endeavor to keep that deal secret. Thus, the State achieved the desired effect of artificially bolstering James's credibility without taking the more overtly unconstitutional step: having James testify affirmatively, but falsely, that there was no deal protecting him from prosecution of other crimes.

If the jury had been informed of the critical deal, James's credibility would have been affected. The jury was not permitted to assess whether James had an expectation of favorable treatment that could have affected his testimony because the State affirmatively placed false evidence before the jury that there was no deal. *See Campbell v. Reed*, 594 F.2d 4, 7 (4th Cir. 1979) (noting that the fact that the defendant "was not aware of the exact terms of the plea agreement only increases the significance, for purposes of assessing credibility, of his expectation of favorable treatment").

**[15]** James would not have testified without the secret deal in place, because he was out of subpoena range and would not have been available for trial but for his agreement to be flown in for trial by the prosecution. Without the testimony of James, an entirely different trial would have occurred. If James had known of the secret deal and had testified about it, he would have been subject to impeachment — not only on the existence of the favorable deal, but also on the State's attempts to keep the deal from the jury. The State could not have falsely buttressed his credibility before the jury. Thus, the violation of *Napue* was material.

The violation of the State's independent duty under *Alcorta* and *Pyle* was also material, perhaps even more so. To avoid violating Hayes's due process rights by allowing false evidence to go uncorrected, the State would have been forced to disclose to the jury after James testified that James's testimony concerning the lack of a deal was false; that a secret deal was in place concerning prosecution for the other crimes; and that the State had solicited James's testimony to the contrary knowing that he would be providing false evidence. Such a disclosure would have had a devastating effect on the credibility of the entire prosecution case. It would have affected not only the special circumstance verdict, but also the jury's ultimate decision to impose the penalty of death. *See, e.g., Silva v. Woodford*, 279 F.3d 825, 855 n.25 (9th Cir. 2002) (noting in a capital case that "whatever doubts the jury may have entertained about [the defendant's] culpability as a result of the undermining of [the key witness's] credibility may also have affected their assessment of the appropriate penalty to impose").

**[16]** Thus, Hayes has satisfied the *Napue/Alcorta/Agurs* materiality standard, namely, whether there was any reasonable likelihood that the presentation of the false testimony or failure to correct the record once the false evidence was presented "could have affected the judgment of the jury." *Belmontes*, 350 F.3d at 881 (citation and internal quotation marks omitted). The due process violations have undermined our confidence in the verdict. Because the constitutional error was material, we must reverse the district court and direct the court to grant Hayes's petition for a writ of habeas corpus.

IV

In closing, we must observe that this case is not merely about a peculiar circumstance. As we have noted, this is not the first time we have been confronted in recent years with schemes to place false or distorted evidence before a jury. Our criminal justice system depends on the integrity of the attor-

neys who present their cases to the jury. When even a single conviction is obtained through perjurious or deceptive means, the entire foundation of our system of justice is weakened.

As we stated in *Bowie*:

The authentic majesty in our Constitution derives in large measure from the rule of law — principle and process instead of person. Conceived in the shadow of an abusive and unanswerable tyrant who rejected all authority save his own, our ancestors wisely birthed a government not of leaders, but of servants of the law. Nowhere in the Constitution or in the Declaration of Independence, nor for that matter in the Federalist or in any other writing of the Founding Fathers, can one find a single utterance that could justify a decision by any oath-beholden servant of the law to look the other way when confronted by the real possibility of being complicit in the wrongful use of false evidence to secure a conviction in court.

236 F.3d at 1096.

We reverse the judgment of the district court, and remand with instructions to grant the petition for a writ of habeas corpus.

**REVERSED AND REMANDED.**

TALLMAN, Circuit Judge, with whom KLEINFELD, GOULD, and BYBEE, Circuit Judges, join, concurring in part and dissenting in part:

I concur in Parts I, II-A, II-B, and III-A of Judge Thomas's opinion for the court. There are few things more repugnant to

the fundamental notions of fairness embodied in due process than a prosecutor allowing false evidence to go uncorrected when it appears. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). In their solemn constitutional obligation "as [ ] representative[s] of the government to protect the integrity of the court and the criminal justice system," *Northern Mariana Islands v. Bowie*, 243 F.3d 1109, 1122 (9th Cir. 2001), prosecutors have a "special duty commensurate with [their] unique power, to assure that defendants receive fair trials." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000). The majority appropriately rejects the State's argument that *Napue* and its progeny prohibit only perjury. The prosecutor's failure to correct the misimpression left on the jury and the court as to the full scope of the deal offered to secure the testimony of Andrew James, even though the witness himself was ignorant of all benefits he would realize from his cooperation, is as objectionable to due process as perjury.

However, in considering all of the evidence presented to this jury in determining Hayes's guilt, I respectfully disagree with the court's conclusion that there was a reasonable likelihood that the information the prosecutor withheld from James and the court could have affected the jury's verdict. In concluding otherwise, the majority misapplies the test for materiality and ignores the substantial evidence introduced at trial otherwise impeaching James's credibility. I fear that by reducing the threshold of what is reasonably likely to affect a juror's judgment the majority has effectively endorsed a per se reversal rule. Therefore, I dissent from Part III-B.[1]

---

[1] I express no opinion as to the majority's opinion in Part II-C. Because I would hold that there was no reasonable likelihood that knowledge of a more favorable deal for James could have affected the jury's judgment, there is no need to consider whether this is a new rule of constitutional procedure that cannot be applied under *Teague v. Lane*, 489 U.S. 288 (1989).

## I.

Despite the majority's unqualified claim that "if it is established that the government knowingly permitted the introduction of false testimony reversal is 'virtually automatic,' " Maj. Op. at 2764 (citing *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)), the Supreme Court has expressly directed otherwise:

> We do not [ ] automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict[.]" . . . A new trial is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury[.]"

*Giglio v. United States*, 405 U.S. 150, 154 (1972) (citing *Napue*, 360 U.S. at 271). Thus, it is not enough to simply find constitutional error. Instead, contrary to the evidence before us in this record, even where testimony is demonstrably false, we are required to determine the materiality of the false evidence at issue by considering all of the evidence and determining whether there was a reasonable likelihood that the false testimony could have affected the jury's judgment. *Giglio*, 405 U.S. at 154; *LaPage*, 231 F.3d at 491.

I disagree with the majority's characterization of the materiality standard as an inquiry requiring the court to consider, not whether the verdict would have been different, but whether the trial was fair and the verdict worthy of confidence. The majority's citation to *Hall v. Director of Corrections*, 343 F.3d 976, 983-84 (9th Cir. 2003) (Tallman, J. dissenting) is unavailing. In explaining the materiality standard in a case involving false evidence, the *Hall* majority improperly plucked the materiality standard from *Kyles v. Whitley*, 514 U.S. 419, 434 (1995), an appeal involving a prosecutor's alleged failure to disclose potentially exculpatory

evidence. The standards, though similar, are not the same. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 103 (1976) (distinguishing the tests for materiality in cases alleging constitutional violation for the use of false evidence and cases involving the failure to disclose exculpatory evidence).

The proper standard, and the one set forth by the Supreme Court, requires us to determine whether, in the context of all the evidence, there was a reasonable likelihood that the false testimony could have affected the jury's judgment. *Giglio*, 405 U.S. at 154; *see also LaPage*, 231 F.3d at 491. Employing that standard, we must use caution in trying to peer inside the minds of jurors who had the distinct benefit of hearing all the testimony and seeing the evidence first-hand.

## II.

To label the testimony of James "false" is a misnomer on these facts. Because James was never told of the secret side deal, James did not testify falsely when he declared that his prior felony charges were still pending and he truthfully testified that he was unaware of any deals or promises made in exchange for his testimony. What offends due process is not James's testimony, but the prosecution's failure to correct that which the prosecutor knew to be false: James's unwittingly untrue statement that he had no deal regarding his pending felony charges. *Napue*, 360 U.S. at 269. The majority reasons that the prosecutor's failure to correct James's testimony kept from the jury impeachment evidence that it might have considered in weighing James's credibility. But, there is no link here between the prosecutor's misconduct and its effect on what James knew at the time he testified about the murder and theft by Hayes. To claim, as the majority does, that there is a reasonable likelihood that James's testimony, in which he truthfully swore he was unaware of any deal, affected the jury's judgment also ignores the substantial amount of impeachment evidence adeptly employed by the defense at trial to impugn James's credibility. It also ignores the fact that

the witness himself was unaware of a benefit the law cautions us to suspect might lead a potentially biased witness to testify untruthfully.

Critically, James testified that the State had given him immunity from all crimes related to Patel's murder — a fact the majority completely discounts. There is no question the jury heard that James was testifying as part of a deal with the prosecution. That the deal also included future dismissal of different conduct is immaterial. The prosecution's undisclosed agreement to provide James additional immunity is, at best, merely cumulative of evidence suggesting that James already had ample motive to color his testimony against Hayes. *Cf. United States v. Cooper*, 173 F.3d 1192, 1203 (9th Cir. 1999) (additional item of impeachment evidence could not have damaged witness much more and there was ample evidence of defendant's guilt without the witness's testimony); *United States v. Marashi*, 913 F.2d 724, 732-33 (9th Cir. 1990) (notes containing cumulative impeachment evidence were not material).

Evidence that James had any kind of deal is relevant only to demonstrate that he had a motivation for testifying adversely against Hayes. However, any motivation James may have had to testify differently for the prosecution because the pending felony charges against him would later be dismissed was nullified because he did *not* know of that term of the deal. The testimony James offered simply could not have been influenced by a deal he knew nothing about. Thus, the wafer-thin likelihood that the jury would have been affected by James's uncorrected statement vanishes altogether. Instead, the majority punishes the State for the due process violation without any regard to its lack of effect on the credibility of James's actual testimony.

The majority reasons that "the fact that the jury was apprised of other grounds for believing that the witness [ ] may have had an interest in testifying against petitioner [does

not turn] what was otherwise a tainted trial into a fair one." *Napue*, 360 U.S. at 270. This, however, is not a case of "other grounds." It is simply invalidating an otherwise credible verdict based on prosecutorial misconduct alone. The jury knew that James had accepted a generous deal from prosecutors giving him transactional immunity for the Patel murder and burglary in return for his testimony. James's deal for immunity from prosecution for his other pending felonies is not "other grounds," but the very same grounds for questioning his motive to color the truth when he agreed to testify against Hayes: a substantial prosecutorial concession to secure James's testimony. Not only is this duplicative of grounds already used to call James's credibility into question, and thus not "other grounds" within the meaning of *Napue*, but it added nothing to the jury's assessment of James's credibility since he himself was unaware of it.

James's testimony, moreover, was far from pristine for reasons unrelated to further prosecutorial immunity. Specifically, James testified that he had received money, airline tickets, and other aid from the State in exchange for his testimony. He also admitted that he was still facing unresolved criminal charges that had been pending against him for the previous two years, and that he had also been convicted of petty theft, grand theft, and receiving stolen property. Yet, with all this evidence unquestionably undermining James's credibility, the majority insists that had jurors heard that James also would later receive a dismissal of the pending felony charges — in addition to his truthful testimony that he received immunity for all crimes related to Patel's murder — there is a reasonable likelihood that their judgment could have been affected. I cannot agree with the court's conclusion that this redundant evidence of his motive to testify against Hayes was the straw which broke an already crippled camel's back.[2]

_____

[2]The majority's assertion that James's credibility was measured against the credibility of his peers is unsupported by any of the evidence. Addi-

The majority's conclusion characterizes James as a "key witness," without whom Hayes could not have been convicted. That conclusion, however, ignores Michelle Gebert's testimony, corroborating James's story, that Hayes told her that he had robbed Patel, and that Hayes assured her that Patel would not say anything to the police. It also ignores identical *modus operandi* evidence from James Cross, who testified that Hayes had previously beaten him, demanded money, and tied his hands and feet with coat hangers — just as Hayes had done to Patel. It ignores the fact that after binding Cross, Hayes took additional money from Cross's pockets and then sent his girlfriend to Cross's room to look for more money.

The court also departs from and misapplies the materiality inquiry required by *Giglio*. The court's analysis goes critically astray by considering the effect on the jury, not of James's actual testimony, but of excluding his entire testimony. Instead of considering what effect James's truthful testimony *could* have had on the jury, the majority concludes that *without* James's testimony and credibility, it is reasonably likely that the remaining circumstantial evidence, resulting in a weaker inference of burglary-murder, *could* have affected the jury's judgment. *See, e.g.*, Maj. Op. at 2781 ("Without the testimony of James, an entirely different trial would have occurred."); *see id.* at 2779 ("Without [James's testimony and credibility], there was only circumstantial evidence of the burglary[.]").

That is simply not the test for materiality. *Giglio*, 405 U.S. at 154 ("A new trial is required if 'the false testimony could

tionally, there is absolutely no evidence in the record that James's transactional immunity was valueless in impugning his credibility. In making these inferential leaps that purport to delve into the minds of jurors sitting in the courtroom over twenty years ago, the majority does here that which it should not — substitute its own judgments for that of the jury by making express but unsubstantiated assumptions about the jury's consideration of the evidence.

. . . in any reasonable likelihood have affected the judgment of the jury[.]' ") (quoting *Napue*, 360 U.S. at 271). We must only consider the marginal effect that the testimony would have had on the jury's verdict, if given fully and completely; not, as the majority proposes, consider the effect that exclusion of James's entire testimony would have had on the jury. *Id.*; *see also LaPage*, 231 F.3d at 491. No rational juror, considering the baggage James carried to the witness stand, would have based his or her verdict entirely on what James said. There was ample other evidence to permit the jury to convict Hayes of the heinous crime for which he faces death. Considered in total, the case against Hayes is far stronger than the majority is willing to admit.

Curiously, the court also postures its analysis as if James's testimony would have suddenly become completely incredible if he had testified that he also had a leniency deal for his pending felony charges. Even without revelation of the secret deal, James's credibility had already been called into substantial question in several ways. Yet, we cannot now say whether jurors disregarded James's testimony and relied on Gebert's testimony that Hayes told her he had robbed Patel, or whether they believed James's story because it was corroborated by Gebert, the autopsy, and the physical evidence at the crime scene. An appellate judge's place is not in the jury box, *post hoc*. We must only consider whether it is reasonably likely that this marginal addition to the evidence could have affected the judgment of the jury. I am satisfied on this record it could not.

Though the prosecutor violated Hayes's due process rights by failing to correct the misimpression left by the unwitting, but truthful testimony of Andrew James, because the majority ignores all of the evidence considered by the jury and misapplies the test for materiality, I respectfully dissent from the court's conclusion that Hayes is automatically entitled to a new trial for a crime he committed more than 20 years ago.